IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Frank D. Willis, et al.,                   Case No. 5:05 CV 121

           Plaintiffs,           MEMORANDUM OPINION
                                       AND ORDER

-vs-                                JUDGE JACK ZOUHARY

Charter Township of Emmett, et al.,

           Defendants.

**BACKGROUND**

Plaintiffs, Frank Willis and Michael Willis, Co-Personal Representatives of the Estate of Christopher Willis, sued several individuals and entities based upon a tragic accident in which Christopher died. Plaintiffs filed their initial Complaint in the Van Buren County Circuit Court, and Defendants removed the case to this Court on the basis of federal question jurisdiction. In their Second Amended Complaint (Doc. No. 103), Plaintiffs allege a claim under 42 U.S.C. § 1983 for violation of Christopher's civil rights. In a Memorandum Opinion and Order (Doc. No. 185), the Court granted certain Defendants' Motions to Dismiss. The remaining Defendants, Emmett Township (the "Township"), Logan Bishop ("Officer Bishop"), and Scott Counts ("Counts"), have now moved for summary judgment on the Section 1983 claim (Doc. No. 193). For the reasons that follow, the Court grants the Motion.

## FACTS

At approximately 6:30 a.m. on July 18, 2003, Christopher was driving a Ford Ranger pickup truck eastbound on Interstate 94 when he lost control of the vehicle, traveled into the median, became airborne and landed in the westbound lanes of the highway. The airborne pickup went over the front of a white Grand Prix in the left westbound lane and collided with a semi-truck traveling in the right westbound lane. The force of the impact separated the cab of the pickup from its frame. When the vehicles came to a rest, the Grand Prix ended up on the north shoulder of the westbound lane; the semi-truck was jack-knifed in the median and partly into the left westbound lane; and the pickup truck was scattered in different locations, with the cab located in the middle of the road approximately sixty feet west of the frame. The cab sat on its roof in a twisted and compressed condition.

Emmett Township rescue personnel were dispatched to the scene. Public Safety Officer Logan Bishop was the first, or one of the first, to arrive. Officer Bishop was both a police officer and a fire fighter for Emmett Township, but that day he was working as a police officer. Officer Bishop assessed the scene, noting the positions and conditions of the vehicles that appeared to be involved in the accident. He walked over to the cab portion of the pickup truck, where several people were standing, saw someone -- apparently a motorist/witness -- who appeared to be checking on the occupant and who indicated he could not find a pulse for the occupant. Another person standing nearby said he also was unable to get a pulse for the occupant. Officer Bishop did not attempt to find a pulse himself, but did observe through the rear cab window the occupant's arm hanging down. Based upon the information he had, including the condition of the cab, Officer Bishop concluded the occupant was dead.

2

Officer Bishop next assessed the condition of the persons near the semi-truck who were reported to be injured. There, he found two injured persons, apparently the occupants of the white Grand Prix. At some point, Officer Bishop reported to dispatch the information he had gathered, although he is not sure whether he advised that the person in the pickup was dead. Officer Bishop stayed with the injured persons until EMTs from Life Care Ambulance Service ("Life Care") arrived. After assisting the EMTs with "backboarding" the victims and loading them into the ambulance, Officer Bishop left to assist in traffic control on westbound I-94.

At some point between the time he arrived and the time he left the scene, Officer Bishop had a brief conversation with Mike Reed, a witness to the accident. The timing and substance of that conversation are in dispute. Reed, who saw the accident occur, says he went to the cab almost immediately after the accident and crawled inside to see if he could get to the occupant. Reed testified he was unable to find a pulse in Christopher's arm but he did observe Christopher breathing. Reed claims that shortly thereafter, he met Officer Bishop, who had arrived at the scene. Reed says he told Officer Bishop the man and woman in the white Grand Prix were okay except the man was complaining of back pain, and the person in the cab of the pickup did not have a pulse but was still breathing. Reed also says he told two firefighters that the person in the pickup was breathing, but he does not know who they were. In contrast, Officer Bishop says he met Reed as he was walking from the cab of the pickup to the Grand Prix. Although Officer Bishop admits Reed informed him of the status of the two occupants of the Grand Prix, he says Reed never mentioned that Christopher was still breathing. In any event, it is undisputed that Officer Bishop never told anyone at the scene that Christopher was reported to still be breathing.

Counts, an Emmett Township fire fighter, arrived on the scene shortly after Officer Bishop.[1] Counts testified someone approached him and told him the accident victims included one person in the pickup, two people in the Grand Prix, and the driver of the semi-truck. Counts saw Life Care personnel attending to the Grand Prix occupants and proceeded to check on the occupant of the pickup truck. Counts saw the person's arm in the back window and made several attempts to obtain a pulse but could not find one. Counts could not find a way to access the interior of the cab. Michael Bentley, a Life Care EMT, and a female EMT approached Counts who told them the occupant had no pulse. Bentley left to check on the injured Grand Prix occupants.

After speaking with Bentley, Counts walked over to speak with Officer Mike Crawford, an Emmett Township police officer and fireman, working as a fireman that day, who had arrived on the scene in another rescue vehicle. Counts advised that he checked but could not find a pulse for Christopher. Counts denies telling either Bentley or Officer Crawford that Christopher was dead or using the term "Signal 15" -- a term used to designate a dead accident victim.

Officer Lance Barbre, like Officers Bishop and Crawford, was both a policeman and a fireman for Emmett Township. The day of the accident he was working as a police officer. Officer Barbre testified that when he arrived on the scene, he saw the accident vehicles and Officer Bishop attending to the occupants of the Grand Prix. He walked over to Officer Bishop to find out the status of the victims, and Officer Bishop told him there was one person dead in the truck and there were two injured persons with whom he was dealing. Because Officer Barbre initially understood Officer

---

[1] Counts gave conflicting statements about whether he was the first emergency responder to arrive on the scene. In his affidavit submitted in support of Defendants' Motion for Summary Judgment, Counts stated Officer Bishop and other emergency personnel were already on the scene (Counts Aff. ¶ 6). In his subsequent deposition, however, Counts testified he was the first one on the scene (Counts Dep. at 21). As the parties acknowledged during oral argument, the order of Defendants' arrival is immaterial to the instant motion.

Bishop to be referring to the semi-truck when he referred to a dead person in the truck, he started walking toward the semi-truck. On his way there, he met Counts. Counts said there was one dead, but he pointed toward the pickup truck, thus clarifying for Officer Barbre the location of the fatality. At Counts' request, Officer Barbre notified the dispatcher there were two injured persons and one dead person, a "Signal 15," at the scene. Officer Barbre then reported this information to Officer Crawford. Officer Barbre remembers telling a Life Care EMT there were two injured in the car and one dead in the pickup truck. He also remembers a Life Care EMT placing a white sheet over the pickup truck. Officer Barbre denies ever telling anyone, including Life Care EMTs, not to go near the pickup truck.

Scott Brandenburg, a Life Care EMT, testified he and his partner, Kim Van Vorst, were the first EMTs on the scene. Brandenburg said that while en route to the scene, he heard over the radio there was a "Signal 15," meaning a fatality. When they arrived at the scene, a Michigan State Trooper directed them where to park their ambulance. As they exited the vehicle, Officer Barbre approached them. Brandenburg asked Officer Barbre where the "Signal 15" was, and Officer Barbre pointed to the pickup. Officer Barbre then raised his hands and said "Don't go there. Your patients are there," as he pointed down the road toward the Grand Prix. Brandenburg said he interpreted Officer Barbre's statement of "Don't go there" as a command forbidding him from going to the pickup. Brandenburg and Van Vorst loaded one of the accident victims into their ambulance and transported him to the hospital.

As these witness accounts show, the rescue personnel on the scene, including Officer Bishop and Counts, quickly concluded that Christopher was dead. This erroneous information was passed on to other rescuers arriving at the scene and was furnished to a local emergency room physician, who

5

in fact pronounced Christopher dead over the phone. Consequently, Christopher was left alone in the pickup truck for over two hours as investigators took pictures of the scene and gathered evidence. As firemen were attempting to extricate Christopher from the wreckage, the Medical Examiner staff examined him and found that he was still breathing, at which point an emergency helicopter was called in to transport Christopher to a hospital. Christopher died shortly thereafter just before 10:00 a.m.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## DISCUSSION

### *Section 1983 Claim*

In the instant Motion, Defendants request summary judgment upon Plaintiffs' Section 1983 claim. To succeed on a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws, and must show that the deprivation was committed by a

6

person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). "If a plaintiff fails to make a showing on any essential element of a § 1983 claim, it must fail." *Redding v. St. Edward*, 241 F.3d 530, 532 (6th Cir. 2001). There is no dispute that Officer Bishop and Counts were acting under color of state law. Plaintiffs contend Defendants are liable under Section 1983 for violating Christopher's rights under the Fourth and Fourteenth Amendments.

Construing the evidence in a light most favorable to Plaintiffs, the material facts for purposes of the Court's analysis are that: (1) Officer Bishop ignored witness Mike Reed's statement that Christopher was still breathing and instead concluded, based upon a bystander's comment that Christopher had no pulse, that Christopher was dead; (2) Counts concluded Christopher was dead based upon both his failed attempts to obtain a pulse and the severity of the wreckage; (3) Officer Bishop and Counts shared their conclusions with others, including Officer Barbre, and those conclusions were relied upon for purposes of determining which victims would receive treatment; and (4) Officer Barbre told EMT Brandenburg not to go to the pickup truck where the "Signal 15" was located, but instead to treat the occupants of the Grand Prix.

### 1. Plaintiffs cannot establish a Fourth Amendment violation

In its earlier Memorandum Opinion and Order, the Court noted that while Plaintiffs mentioned a Fourth Amendment violation in their Complaint, they failed to address the Fourth Amendment in their Motion. The Court also noted there was no plausible argument that Christopher was seized within the meaning of the Fourth Amendment. In their supplemental brief in response to the instant Motion, Plaintiffs again state they are asserting a Fourth Amendment violation, but again provide no analysis or argument regarding such a claim. In any event, there is simply no evidence to support a

7

Fourth Amendment claim. The Sixth Circuit has stated that "the various definitions of 'seizure' contained in the precedents connote an intentional interference with a person's liberty by physical force or a show of authority that would cause a reasonable person consciously to submit." *Peete v. Metro. Gov't of Nashville & Davidson County*, 486 F.3d 217, 220 (6th Cir. 2007) (citing *Scott v. Harris*, __ U.S. __, 127 S. Ct. 1769, 1776 (2007)). Nothing in the record suggests Officer Bishop or Counts did anything to interfere with Christopher's liberty through an intentional use of physical force or a show of authority.

### 2. Plaintiffs cannot establish a Fourteenth Amendment violation

Plaintiffs contend Defendants violated Christopher's substantive due process right under the Fourteenth Amendment by failing to provide him medical care and/or by prohibiting others from accessing Christopher in order to provide medical treatment. Plaintiffs concede that *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), holds that the Due Process Clause of the Fourteenth Amendment does not require a state to provide medical care to those in need. They argue, however, that this case falls within the two exceptions identified in *DeShaney*: (1) the custody exception; and (2) the "state-created" danger exception.

"The 'custody exception' triggers a constitutional duty to provide adequate medical care to incarcerated prisoners, those involuntarily committed to mental institutions, foster children, pre-trial detainees, and those under 'other similar restraint of personal liberty.'" *Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005) (quoting *DeShaney*, 489 U.S. at 200). Custody requires "an affirmative act by the state that restrains the ability of an individual to act on his own behalf." *Id.* In its earlier decision, this Court, citing *Jackson*, held that the custody exception fails because, as in *Jackson*, Christopher's liberty was restrained by his own physical and mental incapacity to remove himself

from the wreckage of the pickup truck and not by the actions of any Defendant. Although that decision was in the context of a motion to dismiss under Federal Civil Rule 12(b)(6), discovery has not changed the underlying premise -- Christopher was restrained by his own circumstances, not by these Defendants.

Plaintiffs attempt to distinguish *Jackson* by arguing these Defendants did more than the defendants in *Jackson* because Officer Bishop and Counts made affirmative showings of their police authority by taking charge of the scene and ordering qualified EMTs not to assess or render aid to Christopher.[2] This argument fails for three reasons. First, contrary to Plaintiffs' suggestion, there is no evidence that Officer Bishop or Counts told any EMT or anyone else not to go near or give aid to Christopher. Nor can Officer Barbre's statement to EMT Brandenburg be attributed to Defendants because there is no evidence that either one instructed Officer Barbre or anyone else to restrict access to Christopher. Second, even giving EMT Brandenburg's testimony a generous reading, it does not show that Officer Barbre was attempting to restrict access to Christopher. Rather, when EMT Brandenburg arrived on the scene, it was assumed by everyone, including EMT Brandenburg, that there was a "Signal 15" or fatality and, in stating "Don't go there, your patients are [over there]," Officer Barbre was merely directing the medical resources where he believed they were needed. In fact, Plaintiffs have failed to cite any evidence in the record that anyone on the scene believed Christopher was alive and sought to render medical aid to him, but was actually prevented from doing

---

[2] Plaintiffs' argument that Defendants restricted access to Christopher is germane not to the *Deshaney* custody and state-created danger exceptions, but instead to Plaintiffs' argument that Defendants interfered with private rescue attempts under the theory recognized in *Beck v. Haik*, No. 99-1050, 2000 WL 1597942 (6th Cir. Oct. 17, 2000). However, because Plaintiffs conflate these separate analyses in attempting to distinguish the applicable cases, the Court will consider Plaintiffs' prevention of rescue arguments in its analysis of the *DeShaney* exceptions.

so in any way by Defendants or any other police officer or fireman. Finally, Plaintiffs' arguments fail in light of *Carver v. City of Cincinnati*, 474 F.3d 283 (6th Cir. 2007).

In *Carver*, Cincinnati police officers and EMTs responded to a 911 call for a suspected cardiac arrest at a local apartment. When they arrived, they found a woman dead on the floor and Carver was lying on a couch. The police left Carver on the couch while they cleared the apartment of all other people and searched for evidence. They found prescription pill bottles indicating the woman had overdosed. However, the EMTs did not treat Carver or transport him to a medical facility. Eventually, he died on the couch. Carver's estate sued the city, various police officers and EMTs alleging a substantive due process claim. In rejecting the plaintiff's claim that the *DeShaney* custody exception applied, the court recognized that "[t]he mere fact that the police exercise control over an environment is alone insufficient to demonstrate that a person is seized." *Id.* at 286. It continued:

> Here, there was no physical restraint over Carver by the officers, nor did the officers direct any actions toward him. Carver's incapacity, like that of the plaintiff in *Jackson*, was self-induced. The officers did not place a restraint on Carver's personal liberty when they secured the area to conduct an investigation into the death of Smith-Sandusky.

*Id.* Similarly, Plaintiffs' allegation that Defendants took control of the scene is insufficient to show custody. As in *Carver* and *Jackson*, Christopher's incapacity was self induced, and there is no evidence that either Officer Bishop or Counts took any actions toward Christopher resulting in a restraint on his liberty.

The state-created danger exception applies when: (1) there is an affirmative act that creates or increases a risk that the decedent would be exposed to private acts of violence; (2) a special danger to the decedent, such that the defendants' acts placed decedent specifically at risk; and (3) that defendants knew or should have known that their actions specifically endangered the decedent.

10

*Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998). Plaintiffs recite these requirements in their brief but fail to explain how any of them is present in this case. The Court need only look to the first element in disposing of this issue, because there is no evidence that Defendants took any act that created or increased the risk of private acts of violence toward Christopher.

Rather than focusing on this exception, Plaintiffs rely upon the statement in *Jackson* that "a constitutional claim may be premised on state action 'cutting off' private sources of rescue without providing an adequate alternative." *Jackson*, 429 F.3d at 591. Plaintiffs note that *Jackson* and *Carver* both found this rule inapplicable because there was no evidence the defendant state actors discouraged or interfered with private aid. Plaintiffs contend this case is different because there is such evidence: EMT Brandenburg testified Officer Barbre told him not to go to Christopher but to attend to the injured occupants of the Grand Prix instead. This argument fails because, as noted above, neither Defendant told EMT Brandenburg not to go near Christopher, nor did they instruct Officer Barbre to prohibit anyone from doing so. Also, as mentioned above, considered in context (that everyone at the scene believed Christopher to be a "Signal 15"), the only reasonable interpretation of Officer Barbre's comments is that he was simply directing EMT Brandenburg to go where he was needed. More fundamentally, however, the argument fails because this case lies beyond the confines of *Beck v. Haik*, 2000 WL 1597942 (6th Cir. Oct. 17, 2000) -- the case *Jackson* cited for the proposition quoted above.

In *Beck*, the decedent and another man jumped or fell from a bridge into a river. Police officers arrived on the scene in response to reports of the two men falling into the river. The decedent disappeared under the water. Two members of a private dive team, under contract with the city to provide rescue and recovery services in situations where the county dive team was unavailable, heard

11

radio reports of the incident and responded to the scene. The volunteers arrived with their equipment, prepared to make a rescue, but police officers instructed the divers not to go into the water because the county dive team had been summoned. The county dive team arrived thirty-five minutes later, but resuscitation efforts were futile by the time the county dive team recovered the body. The decedent's estate alleged that had the volunteer divers been allowed to attempt a rescue, the decedent would have had a better chance of survival.

The Sixth Circuit held the district court was correct that under *DeShaney* the decedent had no right to state-sponsored assistance; however, plaintiff could assert a valid substantive due process claim by showing the government employed an anti-private rescue policy in an arbitrary and irrational manner by preventing qualified divers from making a rescue attempt when a state-sponsored alternative was unavailable. *See id.* at \*3-4. The court also acknowledged that public safety officials may have valid reasons for precluding private rescue attempts, for example, where "police officials are not satisfied that would-be rescuers are equipped to make a viable rescue attempt." *Id.* at \*4. *See also Hermann v. Cook*, 114 F. App'x 162, 166 (6th Cir. 2004) (distinguishing *Beck* on the ground that the defendant officers knew nothing of the volunteer's water rescue qualifications, whereas in *Beck* the officers knew the volunteers were trained civilian divers).

In contrast to *Beck*, this case did not involve a rescue attempt. Rather, all rescue personnel at the scene were operating under the assumption, albeit erroneous, that Christopher was dead. This was true even for EMT Brandenburg, who asked Officer Barbre the location of the "Signal 15." Given this assumption that Christopher was dead and would not benefit from medical assistance, it was neither irrational nor arbitrary for Officer Barbre to tell EMT Brandenburg he should render assistance to the occupants of the Grand Prix. Thus, *Beck* does not apply.

12

### 3. The individual Defendants are entitled to qualified immunity

The defense of qualified immunity involves a two-step analysis. *See Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008). First, the plaintiff must identify a constitutional right that has been violated, and second, the plaintiff must show the right was clearly established at the time of the violation such that the defendant should reasonably have known the conduct in question was unconstitutional. *Sowards v. Loudon County*, 203 F.3d 426, 438 (6th Cir. 2000). If a court finds the plaintiff fails to allege a violation of a constitutional right, it need not reach the issue of qualified immunity. *See Mays v. City of Dayton*, 134 F.3d 809, 813 (6th Cir. 1998).

In this case, the Court has concluded Plaintiffs have failed to establish a violation of Christopher's constitutional rights, thus making a qualified immunity analysis unnecessary. However, even assuming Plaintiffs had established a due process violation, there is no case clearly establishing the right at issue.

When considering the application of qualified immunity, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001). To be clearly established, "the law must be clear in regard to the official's particular actions in the particular situation." *Long v. Norris*, 929 F.2d 1111, 1114 (6th Cir. 1991). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing" violates federal law. *Anderson*, 483 U.S. at 640. While replication of the official's specific conduct is not required to overcome qualified immunity, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law

*in the circumstances.*" *Saylor v. Bd. of Educ.*, 118 F.3d 507, 515 (6th Cir. 1997) (quoting *Lassiter v. Ala. A & M Univ.*, 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc)).

Plaintiffs have failed to identify any authority that could be said to have given Defendants fair warning that their conduct was unconstitutional. At oral argument, Plaintiffs' counsel cited *Estate of Carter v. City of Detroit*, 408 F.3d 305 (6th Cir. 2005), as being factually similar to this case for purposes of qualified immunity. *Carter* is readily distinguishable because it involved a pre-trial detainee's right to adequate medical treatment under the Fourteenth Amendment -- a right the court compared to a prisoner's right to adequate medical treatment under the Eighth Amendment. *See id.* at 311. Here, Christopher was not a pre-trial detainee, nor was he in custody. Plaintiffs' counsel also cited *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir. 2005), but, as the Court mentioned in its earlier decision, *Owensby* is distinguishable because the officers in that case placed the decedent in custody by tackling and handcuffing him and placing him in the back seat of a police car. Again, Christopher was not in custody.[3]

### 4. The Township is entitled to summary judgment

Because Officer Bishop and Counts did not violate Christopher's constitutional rights, the claim against Emmett Township fails as a matter of law. *See Scott v. Clay County*, 205 F.3d 867, 879 (6th Cir. 2000). In addition, the Township is entitled to summary judgment on the separate ground that Plaintiffs have failed to identify a policy or custom of the Township that resulted in the alleged

---

[3] Plaintiffs also cited a number of cases in their brief for the proposition that they may assert a Section 1983 claim based upon deliberate indifference to Christopher's medical needs. *See, e.g., Estelle v. Gamble*, 429 U.S. 97 (1976). As the Court pointed out at oral argument, however, those cases all involved claims by prisoners under the Eighth Amendment, which is not implicated in this case.

unconstitutional deprivation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978); *Lawler v. City of Taylor*, 268 F. App'x 384, 388-89 (6th Cir. 2008).

### 5. State Law Gross Negligence Claim

In response to Defendants' Motion for Summary Judgment, Plaintiffs argued, for the first time,[4] they also had asserted gross negligence claim under Michigan law against Officer Bishop and Counts. During oral argument, the Court inquired about such a claim and granted counsel an opportunity to submit supplemental briefs regarding the legal sufficiency of Plaintiffs' allegations. Plaintiffs argue the Amended Complaint (¶ 84) sets forth a gross negligence claim. The Court declines to pass on the legal sufficiency of this claim, and instead chooses to remand.

Supplemental jurisdiction under 28 U.S.C. § 1367 "is a doctrine of discretion, not of . . . right." *Habich v. City of Dearborn*, 331 F.3d 524, 535 (6th Cir. 2003). The Sixth Circuit has held that it is generally appropriate for a district court to dismiss state law claims without prejudice where all federal claims have been dismissed on summary judgment. *See Brandenburg v. Hous. Auth. of Irvine*, 253 F. 3d 891, 900 (6th Cir. 2001). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996).

In this case, while there is some factual overlap between Plaintiffs' dismissed federal claim and the purported gross negligence claim, the legal issue -- whether Plaintiffs have alleged a gross negligence claim -- is solely an issue of state law. This Court certainly could decide the issue, but

---

[4] Plaintiffs did not argue gross negligence against the defendants previously dismissed, except possibly against Defendant James Campbell and the Court dismissed any such claim against him (Doc. No. 187). Thus, the remand involves only the Township and its officers.

15

Michigan courts have more familiarity with the state law claim, and they are in as good or even a better position to determine whether Plaintiffs have alleged, and if so then whether they have proved, a gross negligence claim. Apart from the substantive issue of gross negligence is the issue of whether a defendant is entitled to an immediate appeal of an order denying governmental immunity. While an immediate appeal is authorized under Michigan law, *see McDowell v. Detroit*, 264 Mich. App. 337, 342-44 (2004), the availability of such an appeal in federal court appears to be an open question and could present an additional legal issue that must be decided if the claim were to remain in federal court. Although this case has been pending for some time in federal court, the remaining state issue can be dealt with more efficiently in state court. In sum, the Court concludes the proper course is to remand the state law claim.

## CONCLUSION

For the foregoing reasons, the Court grants the Motion for Summary Judgment (Doc. No. 193) and dismisses with prejudice the claim under 42 U.S.C. § 1983; and remands to the Van Buren County Circuit Court the state law gross negligence claim against the remaining Defendants Emmett Township, Logan Bishop and Scott Counts, pursuant to 28 U.S.C. § 1367(c)(3).

IT IS SO ORDERED.

                                                       s/ *Jack Zouhary*
                                                       JACK ZOUHARY
                                                       U. S. DISTRICT JUDGE
                                                       7/24/08